COMPLAINT FILED IN UNITED STATES DISTRICT COURT (EASTERN
DISTRICT) OF MASSACHUSETTS

Aaron J. Douglas V. The President and Fellows of Harvard College

LITIGANTS



1. Aaron J. Douglas, **PLAINTIFF** and Pro se Litigant
Residence-Office: 3267 Gunnison Drive, Fort Collins, Colorado,
80526.  Phone: 970-224-1419.  E-mail: <aaron010@comcast.net>.
Plaintiff claims discrimination on the basis of race (African-
American) and color (brown).

2. President and Fellows of Harvard College, **DEFENDANT**; Corporate
address: Office of the General Counsel, Smith Campus Center,
Suite 980, 1350 Massachusetts Avenue, Cambridge, Massachusetts,
02138-3834.  Phone: 917-495-1280.  Robert W. Iuliano General
Counsel and Vice President.  Defendant is a private non-profit
corporation located in the Cambridge-Boston area of Massachusetts
that employees several thousand employees.

TIMELINESS

 3.  The Boston, Massachusetts office of the Equal Employment
Opportunity Commission (E.E.O.C.) advised Plaintiff in a letter
dated June 27, 2014 that the E.E.O.C. did not have jurisdiction

in the matter because Defendant was not Plaintiff's Employer.
Therefore Plaintiff had 90-days after June 27, 2014 to file a
Complaint against the Defendant in Federal District Court.  This
Complaint is filed within the 90-day time limit.


JURISDICTION (4-21)


4. Plaintiff alleges that Defendant is guilty of a violation of
Title VII of the Civil Rights Act of 1964, (P. L. 88-352, Statute
241) (42 U.S.C. § 2000e *et seq.*).  The Act seeks to eliminate all
direct and indirect employment related discrimination practices.
It is an "unlawful practice to hire or to discharge any
individual, or otherwise to discriminate against any individual
with respect to his compensation, terms, conditions, or
privileges of employment because of such individual's race,
color, religion, sex, or national origin" or (for an employer) to
"limit, segregate, or classify his employees or applicants for
employment in any way which would deprive or tend to deprive any
individual of employment in any way that would deprive or tend to
deprive any individual of employment opportunities or otherwise
adversely affect his status as an employee, because of such
individual's race, color, religion, sex, or national origin."
(Quoting from Title VII, UNLAWFUL EMPLOYMENT PRACTICES, Sec.
2000e-2 (Section 703), (a) Employer practices).


5.  However, the above citation does not cover Plaintiff's

allegations because Defendant (President and Fellows of Harvard College; widely known as Harvard University) was not Plaintiff's employer at the time of the alleged violations.  However, the term "employer" in the above section is interchangeable with the broader term "respondent".

6.  In Sec. 2000e-2 (Section 703), (k) Burden of Proof in disparate impact cases, 1(A) "An unlawful employment practice based on a disparate impact is established under this subchapter only if-(1) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related to the business in question and consistent with business necessity....".

7.  Harvard University is the publisher of two economics journals including the *Quarterly Journal of Economics* and the *Review of Economics and Statistics*.  Plaintiff alleges that these journals discriminate against African-American and African (AA-AF) economists thereby restricting their access to research grants, professional upward mobility, and tenure and higher pay.  Journal editors bear responsibility for biased outcomes.  The editorial staffs of the *QJE* and the *RES* are largely composed of Harvard University faculty.

8.  It is relatively easy to document the fact that the publication of peer review journal articles is the most important prerequisite for moving from the low assistant professor pay grade(s) to the highest pay grade of tenured full professor.  A tenured professor does not renew his contract annually but is given a permanent position.

9.  Defendant bears the burden of providing an affirmative "business necessity" defense if plaintiff supplies evidence of a practice that has an adverse impact on the minority group members (see *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 05, 1973).

10.  The publication of peer review journal papers is an "ability test".  However, it is closely related to job performance.  Hence, a demonstrable adverse impact of this test is not "discriminatory" on conventional grounds.  However, the criteria for acceptance of a publication manuscript are highly subjective.  The selection of an orchestra player for a municipal orchestra on the basis of the quality of their musicianship is equally job related and rests on subjective criteria.  Furthermore, in the past the equity of the procedure for selecting economics manuscripts for publication and offering chairs in symphony orchestras were similar because the gender, age, race, and color of the competitors were hidden from the selection committees.

11.  The blind peer review process--removing the names of the

4

authors before sending the papers to the peer reviewers--and the use of a screen to shield orchestra applicants from a selection committee insured equity in the selection process.

12.   However, the rise of the Internet has had a profound impact on the blind peer review process as practiced by economics journals.  "Blind peer review" has been crippled by the widespread practice of posting economics papers to Internet sites before they are sent out for peer review.  The journals published by the highly prestigious American Economic Association (AEA) abandoned the practice of removing authors names from manuscripts before sending them out for peer review in July of 2011.  The AEA cited the increasing effectiveness of Internet author-title searches as the cause for abandoning the practice.

13. The papers submitted by Plaintiff to the *RES* and the *QJE* **were not sent out for blind peer review but were rejected by the editorial staffs of the journals.**  Moreover, the papers and Plaintiff's photograph were posted to a website maintained by Plaintiff.   The URL of the website was on the papers and in fact the **Harvard journals solicit the URL's of websites on which newly submitted manuscripts have been posted.**  Manuscripts that pass a level one review are sent out by the editors for a "blind" peer review (however, the AEA asserts authentic blind peer review is no longer a viable option for economics manuscripts).

14.   The facts discussed in paragraphs 9-11 provide a backdrop
for Federal employment discrimination court cases in which
subjective criteria are used in hiring and promotion decisions.
Clearly, this body of case law is not applicable to the selection
of applicants for positions in a symphony orchestra.   They are
relevant to the present instance of the use of subjective
criteria in the selection process for economics manuscripts
submitted to peer review journals.

15. The courts have often ruled that disparate impact analyses to
demonstrate an adverse impact of a an objective ability test if
the test in question was not closely related to job performance.
For example, in *Lopez v. Commonwealth*, 463, Mass. 696. 2012 the
Massachusetts Supreme Court ruled that plaintiff's data
demonstrated third party interference by the agency administering
the test because the test was not closely job related.

16.   In *Lopez*, 2012 minority group applicants for promotion were
adversely impacted by the tests; only whites had test scores that
qualified them for promotion.   The **tests were objective
multiple choice exams.**   The Court ruled that the state agency
administering the test was guilty of third party interference
with the employment rights of the promotion applicants.

17.   A similar situation was the basis of the disparate impact
suit in *Chance v. Board of Examiners*, 485 F. 2d 1167, 2nd Cir.,

1972.  Plaintiffs **used a disparate impact analysis** to demonstrate the adverse impact of an **objective multiple choice ability test** administered to New York City education employees.  Statistical data indicating that very few minority group members received passing scores demonstrated the adverse impact of the examination.  The **agency administering the ability exam** was found guilty of a third party interference violation of plaintiffs (Chance and Mercado's) Title VII employment rights because the test was not closely job related.

18. In  *Atonio v. Wards Cove Packing Co, Inc.*, 810 F. 2d 1477, 9th Cir,, 1987 the Circuit Court ruled that subjective criteria can be discriminatory under Title VII if the subjective elements of the hiring-promotion criteria are closely linked to the observed adverse impact of the hiring and (or) promotion outcomes.  In *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977 at 986, 1988, the U.S. Supreme Court ruled that a **disparate impact analysis** can be applied to subjective promotion criteria.

19. The plaintiff in *Watson,* 1988 was a bank employee who filed suit on the grounds that the promotion criteria were subjective and had an adverse impact on African American employees. Although the 9th Circuit Courts had ruled in earlier cases (see *Atonio*, 1987) that subjective hiring-promotion criterion could be discriminatory the situation was further clarified by *Watson*, 1988.  Note that the Supreme Court reversed the circuit court

7

ruling in favor of plaintiff in *Atonio*, 1987.

20.  The grounds for the reversal of the circuit court's *Atonio*, 1987 decision had little to do with the application of disparate impact analysis to subjective hiring-promotion criteria.  In *Wards Cove Packing v. Antonio*. 490 U.S. 462, 1989 the Supreme Court found that the disparate impact had to be measured by the ratio of successful minority applicants relative to their pool of qualified applicants.  The disparate impact analysis used here does not have this shortcoming.

21.  In a disparate impact analysis statistical evidence may be used to document discrimination without establishing the discriminatory intent by respondent.  In a disparate treatment case, plaintiff must establish the fact that the defendant intended to discriminate.

CASE REVIEW (22-27)

22.  The precipitating actions by Defendant were the rejection of Plaintiff's economics research papers by two economics journals published by Harvard University including the *Review of Economics and Statistics* (*RES*) and the *Quarterly Journal of Economics* (*QJE*).  The papers were "Inefficient Capital Allocation and the Intertemporal Harvesting of Renewable Resources" (E-mail attachment of *RES* rejection letter dated September 12, 2013; *QJE*

8

rejection E-mail dated November 17, 2013); and "Spreading
Harvesting Through Time With Efficient Harvesting Policies" (*RES*
E-mail electronic rejection dated November 25, 2013).

23.   These papers are posted on Plaintiff-Appellants website
<ajdouglasecon.com>.  However, "Inefficient Capital Allocation
and the Intertemporal Harvesting of Renewable Resources" was not
posted on the website when the paper was received by the *RES* on
September 3, 2013.  Both were later posted on Plaintiff's website
before they were submitted to the *QJE* ("Inefficient Capital
Allocation and the Intertemporal Harvesting of Renewable
Resources") and *RES* ("Spreading Harvesting Through Time With
Efficient Harvesting Policies").  The URL of Plaintiff's website
was listed on the covers and Plaintiff's photograph posted on the
website.  Neither was sent out for blind peer review.

24.   Plaintiff filed a complaint with the Massachusetts
Commission Against Discrimination (MCAD) in December of 2013.
Plaintiff alleged that data base searches indicate that
Defendant's economics journals published fewer economics papers
than other journals and therefore Harvard was guilty of third
party interference with Plaintiff's right to seek employment and
promotion as a U.S. citizen.  Plaintiff alleged that Defendant
violated (Massachusetts's Statute) M.G.L. c. 151B § 4(A).

25.   However, the MCAD intake office classified Plaintiff-

Appellants complaint as a violation of the Massachusetts Public Accommodation Statutes.  In a December 12, 2013 letter the MCAD stated that they could not investigate the  complaint because Harvard economics journals are not public accommodation venues.

26.  Plaintiff filed a third party interference employment discrimination complaint against Defendant in Massachusetts Middlesex County Superior Court in March of 2014.  The Case was placed on the Civil Docket as MICV2014-00941B on March 7, 2014. Defendant's Answer was a Motion To Dismiss (Memorandum).

27. Plaintiff filed a Opposition to Defendant's Motion To Defense (Memorandum) in response to Defendant's MTD within the 10-day limit.  Defendant in turn filed a (Proposed) REPLY Memorandum in response to Plaintiff's Memorandum of Opposition to Defendants Motion to Dismiss on May 22, 2014.  The Superior Court granted Defendant's request for dismissal in a June 4, 2014 entry on the grounds that Plaintiff did not satisfy the **prerequisites for filing under M.G.L. c. 151B § 4(1)**.  This decision was erroneous because Plaintiff claimed that Defendant violated **M.G.L. c. 151B § 4(A)** (the third party interference statute).

PLAINTIFF'S DATA (28-46)

28. Evidence supporting the discrimination claim include:
(1) From 1973 to 2011 714 mathematics and 1,308 economics

doctorates were given to AA-AF mathematicians and economists respectively (primarily from NSF (<http://webcaspar.nsf.gov.>)); a ratio of 0.5458716

(2) Multiple sources indicate that **all** mathematicians and economists published at roughly the same rate;

(3) Data from multiple sources (including the RePEc website and *Mathematicians of the African Diaspora* (MAD) base(s) (<http:// www.math.buffalo.edu/mad>) and the home pages of AA-AF economists and mathematicians demonstrate a startling disparity; from the 1970's to the present AA-AF economists published 2,554 papers while AA-AF mathematicians published 5,264 papers--a ratio of 2.061081;

(4) The probability that the publication totals of the two groups of AA-AF academicians are a random event is extremely small; it is a positive number with at least 200 zeros in front of the first non-zero entry (i.e., Exp[- 200]) **without adjusting for the difference in the numbers of doctorates in the two groups.**

(5) National Research Council (NRC) (2010; <http://www.nap.edu /rdp>) faculty publication data from 118 departments (at *108* U.S. institutions) granting economics doctorates indicates that the only predominantly African-American (HBCU) institution--Howard University--in this group ranks last among the 108 institutions. However, the RePEc <http://econpapers.repec.org /RAS/>) data base indicates that Howard's s faculty is more prolific than any other HBCU.   There were 1670 peer review papers published by the faculty members of the *108* institutions.  However, only 213

papers would have been published by the group if they had published at the per capita rate of the Howard University economics faculty. Using the binomial distribution to estimate the probability that the two values--213 and 1670--are the consequence of a purely random event results in a probability that is less than [Exp(- 270)].

29. The RePEc (http://econpapers.repec.org/RAS/>) site provides data on the number of papers by AA-AF economists published by the *RES* and *QJE* between 1970 and 2012. Searches conducted in the Spring-Summer of 2013 indicate that 12 peer review journals published 9 or more papers by AA-AF (co-) authors between 1970-2012. The *RES* and *QJE* ranked number 5 and 9 respectively among these journals with 33 and 19 papers. The leaders in this category have published 264 (the *Review of Black Political Economy*; *RBPE*) and 134 (the *American Economic Review*; *AER*). The *AER* is often regarded as the world's premier economic journal (Kalaitzidakis, P., *et al.*, 2003, The Rankings of Academic Journals and Institutions in Economics, *Jour. of the European Econ. Assoc.*; Card, D., *et al.* 2012-13, Nine Facts About Top Economics Journals, NBER site <www.nber.org/papers/w18665>).

30. The differences between the *AER* and *RES* totals are statistically significant. The probability that the publication total difference (for AA-AF economists) of the *AER* and *RES* is a random event is less than Exp[- 15]. The discrepancy in the

totals of the top two and the Harvard journals is 346.  The
difference (346) is enough to produce between 35-to-70 tenure
professors for AA-AF economists (depending on whether 5 or 10 is
the minimum number needed for tenure).  **Note that 35 would
represent an increase of 28% in the number of AA-AF economists
who have published 10 or more papers.**  Moreover, the *RBPE* and *AER*
AA-AF economist publication totals indicate that the lower totals
of the *RES* and *QJE* are not a business necessity.

31.  In his **REPLY** (Memorandum) Defendant raises a substantive
criticism of Plaintiff's Amended Complaint.  In footnote 1 (FTN
1) on page 3 of his REPLY Defendant argues that Plaintiff's
statistics indicating that the most prestigious journal in the
world--the *American Economic Review* (*AER*)--do not have sufficient
context to support his claim of discrimination by the *RES*.

32.  In FTN 1 Defendant vigorously argues that a much
better perspective for the comparison would be provided by
adjusting the data for the relative number of total papers
published for the two journals.  He cites monthly data (May,
2014) indicating that the number of papers published by the *RES*
was less than 10% of the total published by the *AER*.

33.  Plaintiff argues that this type of data examination is a
quintessential *disagreement between the litigants with respect to
material facts*.  Plaintiff will--at trial--argue that the great

prestige of the *AER* implies that a paper published in the *AER* has an equal weight as a paper published in the *RES* regardless of the total number of *AER* papers.  A journal rated in the moderate-to-low prestige range might lower its rating by publishing more papers.  But a very high rated journal could increase its annual publication total in response to growing demand by its readership without lowering its rating.

34. Moreover, a broader examination of a annual data indicates that numerical adjustment for the total number of papers does not gut Plaintiff-Appellants evidence and claims.  However, in FTN 1 of the REPLY Defendant-Appellee claims that "Regardless of whether there are further explanations for these figures, at a minimum, this demonstrates that Plaintiff's efforts to rely on these isolated statistics taken out of context cannot move his pleadings from mere speculation" to a plausible claim for relief.

35. In footnote 1 on page 3 (FTN 1) of his **Proposed Reply In Support of Defendant's Motion To Dismiss** Defendant argues that the numbers of papers published by African-American authors in the Harvard journals and those of the *American Economic Review* should be weighted by the overall number of papers in the journals (quoting from the footnote): "The few statements that are specific to QJE and RES are so lacking in context as to be meaningless.  As an example, Plaintiff compares the number of papers alleged to have been published by African-American and

African authors in the American Economic Review (AER) as compared
to those allegedly published in the Review of Economics and
Statistics (RES) which Plaintiff claims is one of Defendant's
journals.  Plaintiff alleges that the AER published 264 articles
while the RES published on 33, see Am. Compl. ¶35, but Plaintiff
does not refer to these numbers as a percent of the total papers
published and does not make any allegations about the number of
papers each journal publishes.  Perhaps over this time period,
264 was an insignificant percentage of the total papers the AER
publishes, and perhaps 33 was a significant percentage of those
published by the RES.  Indeed, a quick review of the websites for
these two publications suggest that in the May 2014 issue alone,
the AER contained 99 papers and was 590 pages, while the RES,
appears to be a mere 185 pages, publishing only 13.  Compare
http://www.aeaweb.org/articles.pjp?doi+10.1257/aer104.5 with
http://www.mitpressjournals.org/toc/rest/96/2visited5/22/2014.
As noted earlier, Defendant argues that "Regardless of whether
there are further explanations for these figures, at a minimum,
this demonstrates that Plaintiff's efforts to rely on these
isolated statistics taken out of context cannot move his
pleadings from mere speculation" to suggesting that he is
entitled to relief.

36. Defendant's remarks with regard to the deficiencies of
Plaintiff's data demonstrate a close reading of the Complaint and
a notable attention to details.  There is a minor typo; the

journals "in this category have published 264 (the *Review of Black Political Economy*; *RBPE*) and 134 (the *American Economic Review*; *AER*)...." (quoting Plaintiff's Amended Complaint).

37. Data from the websites of the two journals indicates that the 2009 paper publication totals are 60 and 204 for the *RES* and *AER* respectively (using **a single month total as Defendant does is grossly misleading**). A simple adjustment ratio for the AA-AF paper totals is 204/60 = 3.4. Multiplying the aggregate *RES* (AA-AF) total by 3.4, (3.4)(33) = 112.2. Using Excel's Binom.dist function, under the null hypothesis (that the likelihood of an AA-AF author publishing in each of the journals is 0.5), the probability of [112, 133] as a random event is 0.100620. For 2009 adjusted data, the **hypothesis that the RES discriminates against AA-AF authors is rejected at the 5% cutoff level.**

38. However, sampling at two points in time provides a clearer picture. The number of *AER* issues per annum increased from 5 to 7 between 2009-13, and the number of annual *RES* issues increased from 4 to 5 and therefore it is prudent to sample the two periods. The respective 2013 totals for the journals are 119 (*RES*) and 220 (*AER*). The adjustment factor is (220/119) = 1.8487395 and the adjusted AA-AF totals are [61, 133]. Using the binomial distribution and (0.5) as the null probability, the probability that the event is random is $9.17164 [E (- 8)] = 0.0000000917164$. Hence, the **discrimination hypothesis is**

**robustly supported by the 2013 data.**

39.  Combining data from both periods provides more insight from yet another perspective.  A composite picture is provided by summing the adjusted totals for the two periods; this involves using the binomial distribution to examine the likelihood that (266) (*AER*) and (173) (*RES*) is a random outcome.  The random outcome probability for $p = 0.5$ for [173, 266] is 5.25503 [E (- 6)] = 0.00000525503 using Excel{TM}.  **The combined *AER* v *RES* data robustly supports the discrimination hypothesis.**

40.  However, some journals publishing a substantial number of AA-AF authored papers publish fewer aggregate papers than the *RES*.  The relative number of AA-AF authored publication totals of these journals might rise significantly after adjustment.  In 2013, the *Review of Black Political Economy* (*RBPE*) published 25 papers versus the 119 of the *RES*.  Hence, the *RBPE* total should be adjusted upward by a factor of [119/25] = 4.76; the adjusted *RBPE* total is (264)(4.76) = 1,256.64.  The binomial distribution probability for [33; 1,257] and $p = 0.5$ can be estimated with Excel's Binom.dist function; this probability is 0 (i.e., less than 1.00 (E (- 300)).  The probability with the **unadjusted** *RBPE* total of 264 was 1.82693 [E (- 45)].

41.  The unadjusted AA-AF publication total for *Applied Economics* (*AE*; *AE* is published by the American Economic Association along

with the *AER* and others) for AA-AF (co-)authored papers is 51.
The binomial distribution probability for the unadjusted data is
for p = 0.5, [33, 51]; the cumulative probability of this outcome
is [0.0314861] using Excel's Binom.dist function.   The
**discrimination hypothesis is accepted at the 5% cutoff point but
not at the 1% cutoff point.**

42. In 2013, *AE* published 40 papers, hence the adjustment factor
is 119/40 = 2.975.   The adjusted total for *AE* is (2.975)(51) =
151.725.   Hence, the Excel{TM} Binom.dist function calculates the
probability for [33, 152] (under the null, p = 0.5) as 9.38763
[E (- 20)].   The **discrimination hypothesis is robustly supported
by the adjusted data at the 1% cutoff point.**   Adjustment could
strengthen Plaintiff's claims.

43.   The key point is that the arena for settling the disputed
facts is a jury trial.

44.   On page 3 of his "Proposed Reply in Support of Defendant's
Motion To Dismiss" Defendant argues that (first sentence, second
paragraph)"...statistics may be considered to support an
individual plaintiff's allegation that his injury was the result
of a discriminatory policy, see *McDonnell Douglas Corp. v. Green*,
411 U.S. 792, 05 (1973), a number of courts have held that
statistical data cannot represent the entire injury in an action
brought by an individual plaintiff." (From third sentence, first

18

paragraph) "See also Reynolds v. Barrett 685 F. 3d, 202, 203 n.
11 (2nd Cir. 2012) noting that while statistics may be used to
support an individual disparate treatment claim, "statistics
alone do not suffice to establish an individual disparate
treatment claim for a very good reason: the particular Plaintiff
must establish that he was the victim of racial discrimination."

45.    The citation of Reynolds v. Barrett, 685 F. 3d, 202, 203 n.
11., 2nd Cir. (2011) and McDonnell Douglas Corp. v. Green, 411
U.S. 792, 05 (1973) **is misleading** because these were disparate
treatment claims and the Plaintiff here files a disparate impact
claim.    In a **disparate treatment** case, the alleged discrimination
is intentional.

46. In a **disparate impact case**, plaintiff alleges that a
facially neutral practice has a demonstrable adverse impact on
the employment opportunities of minority groups.    The
discrimination **need not be intentional.**

STANDING

47. Plaintiff retired from the U.S. Geological Survey in November
2011.  He seeks employment as a natural resource economist, and
within the last 30-months he has: (1) developed a website
<ajdouglasecon.com> with posted  publications and recent
unpublished papers (in 2012); (2) posted his resume on the

federal website USAJOBS (https://www.usajobs.gov); and (3) sent

resumes to several institutions in the last 24-months.  He failed

to achieve tenure at the U. of California at Berkeley, in 1971,

and failed to achieve promotion from G.S. 13 to G.S. 14 or 15 in

1999 within the U.S. Dept. of the Interior because of a paucity

of peer review journal publications.


RELIEF


Plaintiff asks for frontpay as a Harvard University economics

faculty member.  Courts have been reluctant to ask defendant's to

hire successful discrimination litigants because the action might

displace another employee (*LawMemo*; Remedies for Discrimination

#31; <http://www.lawmemo.com/101/2006/02/remedies_for_dthtml>).

A remedy is to hire Plaintiff as a Research Professor with no

teaching or administrative duties thereby eliminating the adverse

consequence of displacing a potential young employee.


Plaintiff's appointment as a tenured Research Professor of

economics would last for 12-years.  Plaintiff was a Social

Security Supplemental Income (SSI) disability recipient for a

12-year period after he left Harvard in June of 1974 before he

became a federal employee in December, 1986.  The appointment

would be terminated if Plaintiff became ill with a condition that

severely limited his ability to conduct research (the University

could call for a medical examination to confirm Plaintiff's

ability to conduct research).  Prima facie evidence of the
ability to conduct research would include the ability to walk,
drive a car, and attend faculty meetings.  Evidence of the
inability to conduct research would be confinement to a bed for a
**chronic condition** for more than 12-months.

If this case proceeds to trial a copy of Plaintiff's SSI payments
will be introduced as well as documentation of the connection
between the disability and his lack of success as an academician.

Plaintiff was born on March 29, 1940.  Hence, he requests the
defendant pay a conventional full pension for a professor of
economics.  The pension would be paid until Plaintiff dies.  In
addition, Harvard University would supply Plaintiff with an
annual research budget of $150,000 per annum.  Unused funds will
be rolled over to the next academic year.  Research expenditures
will not include: (1) charges for administrative and overhead
costs, or (2) principal investigator salary charges.  The faculty
appointment will include: (1) health coverage for Plaintiff and
his immediate family, (2) a full size office space--not
necessarily in a building with other economics faculty offices--
and (3) a year round free parking space.

The relief request does not preclude Plaintiff's receiving
research funds or another research appointment offering Plaintiff
a salary as a full-time research economist selecting his own

research topics. This claim does preclude taking another
simultaneous appointment as an administrator, teacher, or editor
without the written approval of Harvard University.

Harvard University will guarantee publication of 30 single author
or co-author(ed) journal papers in the *Review of Economics and
Statistics* (*RES*) and the *Quarterly Journal of Economics* (*QJE*).
The time frame for this stipulation will be 14-years. If the 30
papers are published in 12-years, the stipulation expires in 12-
years. If the 14-year period elapses and Plaintiff has not
submitted any papers to the *RES* or *QJE*, Plaintiff cannot publish
papers in the *RES* or *QJE* under this stipulation.

Journal papers published by federal government employees as part
of their federal employment cannot be copyrighted. Hence,
Plaintiff can submit to the *QJE* and *RES* published papers that are
not copyrighted.

Plaintiff will be invited to attend (in person or by conference
call) Economics Department meetings and enjoy full participation
in all tenure rank decision making processes.

Harvard University will supply Plaintiff with payment for moving-
relocation expenses of $1,000,000 after payment of Federal and
Massachusetts taxes. The current effective U.S. Federal tax on a
2013 income of $1,729,054.00 is $638,509.13 and Massachusetts

state tax is $90,544.34. The total state and federal tax is $729,053.47, hence the effective moving-**relocation expense payment to Plaintiff is $1,729,054.00**. Plaintiff may purchase a more expensive home by adding to Harvard's payment. Some funds may go toward repairs but not to maintenance or furnishings.

The 12-year salary for Plaintiff as a member of the Department of Economics of Harvard University will begin at the annual salary of [$401,638 x 2] = $803,276 for the first 2-years (or monthly salary of $803,276/12 = $66,939.67). The annual rate will be $401,638 or $33,469.83 per month for the next 10-years (adjusted upward at the average rate of increase for Harvard University full professors of economics). Even if Plaintiff prevails after a trial and Appellate Court appeal, he would not receive any payments until the end of 2015. It is unlikely that Plaintiff will be fully ambulatory--or even alive--in 2027 or 2028. Hence, he asks for compensation for this likelihood.

In 2011 the American Association of University Professors estimated the average salary of Harvard University and U. of California at Berkeley professors to be $193,800 and $149,100 respectively (Taylor, T., 2011; "UC Berkeley Ranks 13th Nationally for Professor Pay", *Berkleyside* <http://www. berkleyside.com/2011/04/15/uc-berkeley-ranks-13th-nationally-for-professor-salaries/>). The salaries of U. of California Professors are available at a *Sacramento Bee* website; <http:

//www.sacbee.com/statepay/#reg-employee%2Ftop%2Fyear%3D2013>).

The *Sacramento Bee* site indicates that economics Professor David
E. Card at U. California, Berkeley received $309,000 in 2012.
The ratio of the average salaries of Harvard and Berkeley is
(193800/149,100) = 1.299799; (1.299799)($309,000) = $401,638.
Applying the same adjustment factor to Professor George Akerlof's
emeritus (retired) U. of California at Berkeley pension payment
of $39,000 gives an annual pension of $50,692.  Hence, Plaintiff
asks Harvard University to pay Plaintiff a total of $452,330 per
annum with an annual upward adjustment equal to the average
annual wage increase for full economics professors over the 12-
year interval.  Pension payments cease with Plaintiff's demise.

JURY TRIAL

Plaintiff Aaron J. Douglas asks that this matter be tried by a
jury of his peers.  This is his Seventh Amendment (to the U.S.
Constitution) right.  Plaintiff claims that **all** of the issues
raised in the COMPLAINT are triable by a jury.

*Aaron J. Douglas*

Aaron J. Douglas, Plaintiff and Pro Se Litigant
Address: 3267 Gunnison Drive, Fort Collins, Colorado, 80526
Phone: 970-224-1419; <aaron010@comcast.net>
Signature *Aaron J. Douglas*     Date:   08/26/2014